Edward and Darlene **BAKER**, with, and in behalf of their minor child, Glenn Anthony Baker, and all other persons similarly situated, Plaintiffs,

v.

Allen **HAMILTON**, Sheriff and Jailor of Jefferson County, Kentucky, et al., Defendants.

Civ. A. No. 7148.

United States District Court,
W. D. Kentucky,
Louisville Division.

April 25, 1972.

Thomas P. McCarthy, Graham B. Cooke, Legal Aid Society of Louisville, Mitchell Charney, Jefferson County Juvenile Defender, Louisville, Ky., Joe A. Cannon, Ralph M. Faust, Jr., National Juvenile Law Center, St. Louis, Mo., for plaintiffs.

J. Bruce Miller, Joseph V. Mobley, Louisville, Ky., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ALLEN, District Judge.

### Preliminary Statement

This class action was brought by Edward and Darlene Baker, who are the mother and father of Glenn Anthony Baker. Subsequent to the filing of the action, Sarah Ford, the mother of Perry Ford, has entered her appearance as a class plaintiff. The action is brought on behalf of Glenn Anthony Baker, who was seventeen years old at the time of its filing and on behalf of all other persons similarly situated in Jefferson County, Kentucky. The action also is brought on behalf of Perry Ford, who is sixteen years of age.

Plaintiffs ask for declaratory, injunctive and damage relief under Title 28 U.S.C. §§ 1343, 2201, 2202, and Title

42 U.S.C. § 1983. The pleadings allege in substance that the juveniles are being unconstitutionally placed by the Juvenile Court in the Jefferson County Jail. It is alleged that imprisonment and detention of such juveniles in the Jail violates the rights of juveniles to due process of law under the Fourteenth Amendment in that they are not provided rehabilitative care and treatment and punishment without having been committed and found guilty of a criminal offense under the laws of Kentucky.

It is also alleged that subjecting juveniles to imprisonment with adults in the Jail constitutes cruel and unusual punishment in violation of the Eighth Amendment of the Constitution both because of the physical inadequacy and undesirable conditions in the Jail and because the juveniles have not been charged as being criminals under the laws of Kentucky.

A temporary restraining order was issued by this Court on January 7, 1972, restraining the defendants from confining in the Jail all juveniles whose cases were pending before the Juvenile Court, excluding only those persons under eighteen who have been prosecuted as adults or for traffic offenses.

It was ordered that the Juvenile Court be temporarily restrained from confining in the Jail any juveniles committed pursuant to KRS 208.200, and allowing the Juvenile Court the right to waive jurisdiction of an alleged juvenile offender to the Circuit Court and pursuant thereto to place the alleged offender in the Jefferson County Jail by appropriate order.

Defendant, Allen Hamilton, is the Sheriff of Jefferson County, Kentucky, and the Jailer thereof. Judge Louis J. Hollenbach III is the Jefferson County Judge. His signature is formally required on all orders entered by the Juvenile Court but usually this is done as a formality inasmuch as the County Judge cannot possibly devote his time to Juvenile Court matters.

Judge David Thompson is the Chief Trial Commissioner of the Juvenile Court Division. He has two Trial Commissioners who act under his supervision, Judge Darrell Owens and Judge David Armstrong.

Arnold Robinson was the Warden of the Jefferson County Jail from October 1971 to January 15, 1972.

Following the overruling by the Court of the defendant's motion to dismiss or to consolidate and the filing of an answer by the defendants in which the defendants disputed the rights of the plaintiff to bring this action as a class action and denied all of the legal conclusions alleged by the plaintiffs, as well as some of the factual allegations, this action was originally tried by the Court on February 11, 1972. After the completion of plaintiff's proof, defendants were granted a continuance and subsequently filed their proof in the form of depositions of defendants, Hamilton, Thompson and Robinson. Oral arguments were held on March 27, 1972, and the case now stands submitted to the Court for a decision.

## FINDINGS OF FACT

Glenn Anthony Baker, a seventeen year old child, was sentenced by Judge Thompson on January 3, 1972, to four days in the Jefferson County Jail with the remainder of his time to be spent at Southwick Correctional Center for Juveniles. At the time of the dispositional hearing, Darlene Baker, Glenn's mother, was present but apparently no counsel was appointed for Glenn and no psychological or psychiatric reports were received. Judge Thompson committed him to the Jail on the theory that a few days confinement would constitute shock treatment which would be of value to Glenn. The only papers sent to the Jail by Judge Thompson in this and similar cases consists of what is known as a Commitment Order which states that the juvenile is being committed to the Jail for a violation of KRS 208. Judge Thompson testified that he thought Baker had been guilty of prior delinquencies

but that he could not be certain at the time he was committed to the Jail.

James Matthews, seventeen years old, was in the Jail in July 1971 for two weeks. He was placed in solitary confinement for four days for creating a disturbance. He claims that he had no blanket or mattress furnished him and that while in the hole he slept on the concrete floor. He complained about filth and human spit and vomit being found near his cell.

Perry Ford, a sixteen year old juvenile, was confined to the Jail for about four weeks. While there he stated that he had to sleep on springs with a newspaper serving as a cover until another inmate left the Jail and gave him his mattress. He testified as to an act of homosexuality between two inmates in the Jail and that advances were made to him by two other prisoners. He had been charged with storehouse breaking and had been previously before the Juvenile Court five or six times.

Dr. Basil Komisaruk, a child psychiatrist and physician who has had much experience in juvenile delinquency, juvenile psychology, and juvenile court work, examined the Jail on January 28, 1972. He found it to be a deplorable facility and described it as the worst he had ever seen. He reached the opinion that it was counterproductive and a reprehensible practice to place juveniles in an adult jail, especially the Jefferson County Jail. He based this opinion on his observation that juveniles are status seekers and that they seek to pass what is known as initiation rights and to obtain acclaim from their peer group. As to juvenile delinquents, he is of the opinion that when placed in an adult jail they try to identify with the older criminals and seek status by being placed in such an institution. He did recommend that in certain instances it might be wise to afford the juvenile delinquent a tour of the jail but that they should be placed in an institution where they were afforded educational facilities, recrea-

tional facilities, clinical help and rehabilitation. He testified that some 25% to 30% of juvenile delinquents need psychiatric or psychological treatment.

The Court, with the consent of counsel, visited the Jefferson County Jail in late January, 1972. From the Court's observation and the testimony of the witnesses, the following is found to be the condition of the Jail.

It is an old structure built in 1907. One of the defendants referred to it as a "decrepit" structure and one admitted that a characterization of it by a grand jury as a disgrace was true. The Jail is drafty and is subject to the influence of extreme heat and cold on the outside. Some of the windows were broken out and many light bulbs needed replacing. To the credit of the defendant Hamilton, he has asked for an appropriation for indirect lighting and for the replacement of the windows. Many of the locks on the cell doors have been inoperable and here again Sheriff Hamilton has asked for appropriations to remedy this situation. The cells themselves are 5′ x 9′ and have two bunks in them, a sink and a toilet. They also have one overhead bulb as illumination. The cells open out onto walks on each of the four floors on which cells are located. The materials used in the Jail are practically all of steel, and the steel has deteriorated to such an extent that prisoners have often been able to fabricate knives and other weapons from the deteriorated metal.

The Jail contains a solitary confinement cell which is known as the "hole." Judge Thompson described the condition thereof as being horrible. Since the restraining order was entered, some efforts have been made to improve conditions there in the form of a light bulb and a mattress.

When juveniles enter the Jail, some effort is made to place them with lesser offenders. Judge Thompson testified that some of the tougher juvenile offenders would be placed on walks with more hardened criminals. The Jail con-

tains about 400 inmates on the average. The variety of prisoners held there range from persons who have been convicted of the most serious felonies to those who are awaiting trial for misdemeanors and other minor offenses. Federal prisoners are held there, also, while awaiting trial, although it is contemplated that they will soon be using the facilities of the City Jail.

There has been one major disturbance at the Jail during 1971 when tear gas was used to quell the disorder. There has been one suicide in the Jail during the last year and three prisoners have died there. There are fights on occasions between inmates of the Jail, and there was one occasion where an act of perversion was performed upon a juvenile, although apparently by five other juveniles. Many alcoholics are confined in the Jail for periods of as much as ten days and often go through their withdrawal symptoms while there and add to the confusion and noise of the Jail by their shouts in manifestation of withdrawal symptoms.

The Court found the kitchen facilities to be clean and did not see any rats, vermin or bugs while in the Jail, although it is admitted by the defendants that some are bound to be in the building. There is a small gymnasium which is made available to less hardened offenders, and there is a very small library. There is a Chapel which is open to all the prisoners for religious purposes.

The Jail employs a psychiatrist who is there for two and one-half hours a week. His primary duty is to confer with prisoners who are charged with crimes in order to see whether or not they are capable of standing trial and assisting in their defense.

Defendant Hamilton has recently employed a physician who will be on duty for two hours a day each day of the week. In addition, there are two nurses who are on the Jail work force. Also, the Jail has six social workers who act as liaison between the prisoners and the outside world. As stated by defendant Hamilton, they do not hold degrees in social work and do not pretend to give in-depth treatment or assistance to the prisoners.

It is established that Judge Thompson and his Trial Commissioners ordered sixty juveniles to be confined in the Jefferson County Jail in 1971. Forty five were held there prior to disposition of their cases, and fifteen were there for periods of time ranging from as little as twenty four hours to thirty days.

Since the entry of the restraining order, Judge Thompson had occasion to order five juveniles who were at the juvenile detention center in Louisville to be placed in the Louisville City Jail. He did this on the basis of a report from the Juvenile Center and without a hearing. This occurred on the weekend when he felt he could not obtain counsel for the children, but it was his testimony that where such emergencies do come up he does not obtain counsel and have a hearing but transfers the children immediately to an adult jail facility and then on the next work day has the children brought into his Court to determine what should be done with them at that time. He stated that in this particular instance the children were called back before him two days after their detention in the City Jail and that they are still in the City Jail because they advised him that they liked the facilities there.

Judge Thompson places juveniles in an adult jail for detention purposes because of his belief that such juveniles are so tough and mature physically that they cannot be controlled at the detention center or have created a disturbance at that center or have interfered with its functioning. As to the others he has placed in the Jail as a part of the disposition of their cases, this is done for shock value and is not based on any psychological or psychiatric advice given to the Judge but purely because of his belief that juveniles who are hardened

physically and sophisticated in their outlook should observe the realities that confront them when they reach adulthood if they do not change their ways.

Judge Thompson is of the opinion that confinement of juveniles in the County Jail does not have any adverse effect on them because of the relatively short period of confinement. It is established that Glenn Anthony Baker and Perry Ford apparently suffered no physical or mental harm as a result of their confinement in the Jail.

Judge Thompson has a tremendous case load amounting to some 700 to 800 cases which are disposed of by him, as well as some 6300 more which are on his docket. This would indicate on the basis of a forty-two hour work week with the cases that he has only five minutes or so in which to study each case.

## CONCLUSIONS OF LAW

1. Jurisdiction of this Court is vested under Title 42 U.S.C. § 1983, Title 28 U.S.C. § 1343(3) and (4), and 28 U.S.C. § 2201.

■ 2. This action is properly maintainable as a class action. See Jones v. Wittenberg, 323 F.Supp. 93 (D.C.N.D. Ohio, 1971). At page 99 of that opinion, District Judge Don J. Young stated as follows:

"It is apparent also that this action can only be maintained realistically as a class action, the class consisting of those persons who at any given point of time are confined in the Lucas County Jail. The claims of any particular individual could easily become moot at any time, and must become moot within a relative limited period. It is also very difficult to demonstrate that any one individual has suffered a specific wrong which can be righted without regard to the totality of wrongs in the system."

Jones v. Wittenberg was affirmed by the United States Court of Appeals for the Sixth Circuit in the case of Jones v. Metzger, 456 F.2d 854, decided and filed March 14, 1972.

3. The next question to be decided is whether or not the confinement of forty five juveniles for detention purposes to the Jefferson County Jail and fifteen juveniles for dispositional purposes to the same institution during the year 1971 constituted a violation of the Fourteenth Amendment rights of those sixty juveniles. In this case it is to be noted that Judge Thompson intends, if allowed to do so by this Court, to continue the practice followed in 1971 into the future, and he also stated that it has been a practice in the past to selectively send juveniles to the Jefferson County Jail for brief periods of detention or as a part of their dispositional sentence.

KRS 208.080, 208.110, 208.120 and 208.130 effectively control the custodial disposition of children pending a dispositional hearing. Without citing these statutes at length, it appears that ordinarily the Juvenile Court issues a summons directing the custodian of a child to bring the child before the Court following the filing of a petition of preliminary inquiry pursuant to KRS 208.070. If the Court feels that it is necessary that the child's custody be immediately assumed by the Court, then he requires the officer serving the summons to take the child into custody and to place him, in the case of Jefferson County, in a permanent detention home. KRS 208.-130(2) and KRS 208.080. See, also, KRS 208.110(4).

KRS 208.120 provides specifically that no child under sixteen shall at any time be detained in any police station, lockup, jail or prison except that, on the basis of a hearing for that purpose, by the Juvenile Court Judge, a child whose conduct or condition is such as to endanger his safety or welfare or that of others in the detention facility for children, may be placed in a jail or other place of detention for adults, *but in a room or ward entirely separate from adult prisoners.* (Emphasis ours).

As to the disposition of juveniles who are not charged with a felony, KRS 208.140 and KRS 208.200 contemplate that after a full investigation and final hearing and a finding that the child has committed a public offense, the court may place the child either in his own home, a suitable family home or boarding home or a private or public institution other than the Child Welfare Department or commit the child to the Child Welfare Department for an indeterminate period not to exceed the age of twenty one:

■ An examination of Chapter 208 reveals that the primary concern of the legislature was ,that children under the age of eighteen should be treated differently from adults who have committed crimes. For example, KRS 208.110(1) provides that children are not entitled to bail. This provision has recently been upheld by the Court of Appeals of Kentucky in the case of Baker, Director of Jefferson County Children's Center v. Smith, Ky., 477 S.W.2d 149 (1971). Throughout the statutes are found references to the welfare of the child. See, for example, KRS 208.200(a), KRS 208.-120, KRS 208.330(3), pertaining to rehabilitation, and, more specifically, KRS 208.440 which provides that the Department of Child Welfare shall be responsible for the development of such additional facilities as are necessary and provide an adequate and modern program for the care, treatment and rehabilitation of children. See, also, KRS 208.520 which is to the same effect emphasizing the rehabilitation, training and education of juvenile delinquents.

In three recent decisions, the United States Supreme Court has had occasion to stake out the rights of juveniles in juvenile court proceedings. In the case of In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), the Court specifically held that where a dispositional hearing is held for a juvenile which may result in his confinement to a juvenile institution, he is entitled to the right to be notified in writing of the hearing, the right to counsel, whether appointed or selected by him, the right to confrontation of the witnesses and the right to present evidence and cross-examine witnesses produced by the state.

In the case of McKeiver v. Pennsylvania, 403 U.S. 528, 91 S.Ct. 1976, 29 L. Ed.2d 647 (1971), the Supreme Court held that juveniles are not entitled to jury trials in cases where their commitment will be to a juvenile facility. A concurring opinion by Mr. Justice White states the applicable philosophy for the juvenile court's assertion of jurisdiction.

"Coercive measures, where employed, are considered neither retribution nor punishment. Supervision or confinement is aimed at rehabilitation, not at convincing the juvenile of his error simply by imposing pains and penalties . . . A typical disposition in the juvenile court where delinquency is established may authorize confinement until age 21, but it will last only so long as his behavior demonstrates that he remains an unacceptable risk * * *. Nor is the authorization for custody until 21 any measure of the seriousness of the particular act which the juvenile has performed."

In Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966) the Supreme Court considered the requirements for a valid waiver of the exclusive jurisdiction of the juvenile court of the District of Columbia so that a juvenile could be tried in the adult criminal court of the District. Although the Court's decision turned on the language of the statute, it emphasized the necessity that the basic requirements of due process and fairness be satisfied in such proceedings.

In Haley v. Ohio, 332 U.S. 596, 68 S. Ct. 302, 92 L.Ed. 224 (1948), the Supreme Court held that the Fourteenth Amendment prohibited the admissibility of a confession by a fifteen year old boy in a state court of general jurisdiction under the circumstances of the case. As stated in *Gault*, 387 U.S. on page 13, 87

S.Ct. 1428, 18 L.Ed.2d 527, neither the Fourteenth Amendment nor the Bill of Rights is for adults only.

In Stewart v. Coughlin, No. 71C-1793 (D.C.N.D.Ill., 1971), the United States District Judge released four juveniles held for confinement in a penitentiary type institution for periods longer than adults would be required to spend for the same offenses. The Court held that as a matter of fact and as a matter of law this constituted a violation of the equal protection law clauses of the Fourteenth Amendment to the Constitution of the United States (see page 23).

In the case of White v. Reid, 125 F. Supp. 647 (D.C.D.C., 1954), Chief Judge Laws points out at page 649 that in upholding the constitutionality of juvenile court acts, the Courts have emphasized not only that the proceedings are non-criminal, but also that the institution to which the juvenile is committed is not of a penal character. On page 650 Chief Judge Laws points out that the basic functions and purposes of penal institutions are punishment as a deterrent to crime and that unless the institution to which a juvenile is committed is intended for and adapted to guidance, care, education and training rather than punishment, and unless its supervision is that of a guardian and not that of a prison guard or jailor, commitment to such institution is by reason of conviction of crime and cannot withstand an assault for violation of fundamental constitutional safeguards.

In reaching its decision on this phase of the case, the Court takes note of the fact that the Jefferson County Jail does not provide separate rooms or wards for juveniles. It takes note of the fact that it is a penal institution designed primarily for punishment rather than rehabilitation. It takes note of the fact that the Juvenile Court Judge does not hold hearings as contemplated by KRS 208.-120 before sending pre-dispositional juvenile offenders to the county jail, and that the hearings are without counsel.

The Court is of the opinion that the present system used by the Juvenile Court Judge and his Trial Commissioners of selective placement of forty five juveniles in the Jefferson County Jail in pre-dispositional matters and of fifteen juveniles as a dispositional matter, even though these commitments be for limited periods of time, constitutes a violation of the Fourteenth Amendment in that it is treating for punitive purposes the juveniles as adults and yet not according them for due process purposes the right accorded to adults. No matter how well intentioned the Juvenile Court Judge's acts are in this respect, they cannot be upheld where they constitute a violation of the Fourteenth Amendment.

We come now to the question of whether or not the commitment of the sixty juveniles referred to above in 1971 constituted a violation of the Eighth Amendment of the United States Constitution. The Court reaches the conclusion that such confinement does violate the Eighth Amendment and relies upon the case of Jones v. Wittenberg, supra. In *Jones*, Judge Young referred to the conditions in the Lucas County Jail as follows:

"We may suppose that the constitutional provision against cruel and unusual punishment was directed against such activities. In any event, when the total picture of confinement in the Lucas County Jail is examined, what appears is confinement in cramped and overcrowded quarters, lightless, airless, damp and filthy with leaking water and human wastes, slow starvation, deprivation of most human contacts, except with others in the same sub-human state, no exercise or recreation, little if any medical attention, no attempt at rehabilitation, and for those who in despair or frustration lash out at their surroundings, confinement, stripped of clothing and every last vestige of humanity, in a sort of oubliette."

*Jones* held that confinement in the Lucas County Jail as to adults violated the

Eighth Amendment. This Court realizes that conditions in the Jefferson County Jail are not as bad as the Lucas County Jail and that the officials of Jefferson County are making substantial efforts to improve conditions, but is of the opinion that there are sufficient elements present in the Jefferson County Jail to hold that confinement therein as to juveniles constitutes cruel and unusual punishment. Specifically, these elements are as follows—cramped quarters, poor illumination, bad circulation of air, broken locks, no outdoor exercise or recreation, and no attempt at rehabilitation, in addition to the condition of the "hole", which Judge Thompson described as horrible.

Certain discussion arose concerning the utilization of the Louisville City Jail in lieu of the Jefferson County Jail on those occasions when circumstances allegedly demanded such use. The Court is of the opinion that the Juvenile Court may employ the Louisville City Jail, but only under extreme emergency conditions and only then on a temporary basis. The Court is cognizant of the fact that cases might arise where a youngster would be a hazard to the ordinary juvenile facility, and, in the event that maximum security measures were not available at the juvenile center, that it might be necessary for the Juvenile Court Judge to place the juvenile temporarily in a jail-type institution. The detention of juveniles in the Louisville City Jail, moreover, is further limited by the requirement that there must occur a preliminary hearing prior to incarcerating the juvenile offender and a separation of juveniles from adult prisoners, pursuant to KRS 208.120.

4. Plaintiffs have each claimed $100 damages. No proof was introduced to show that they suffered measurable physical pain or injuries to warrant recovery of monetary damages. Therefore, their claim for damages is denied.

The Court will enter a permanent injunction forthwith following the entry of this Findings of Fact and Conclusions of Law.